**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TERRY-ANN DOUGLAS,**<br>                    **Plaintiff,**<br><br>                **v.**<br><br>**KENSINGTON COMMUNITY**<br>**CORPORATION FOR INDIVIDUAL**<br>**DIGNITY d/b/a KENCCID,**<br>                    **Defendant.** | **CIVIL ACTION**<br><br><br>**NO. 24-284** |

**HODGE, J.**                                                    **MARCH 31, 2025**

<u>**MEMORANDUM**</u>

Terry-Ann Douglas ("Plaintiff") has filed this case against Kensington Community Corporation for Individual Dignity ("Defendant") for violations of the Americans with Disabilities Act (42 U.S.C. §§ 12101 *et. seq.*) ("ADA"), the Family and Medical Leave Act (29 U.S.C. §§ 2601 *et. seq.*) ("FMLA"), the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO"). (*See generally* ECF No. 1.). Defendant has filed a Motion to Dismiss ("Motion"). (ECF No. 7.) Upon review of the pleadings, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

I.    **BACKGROUND**[1]

Plaintiff was hired by Defendant as a Benefits Coordinator on or about July 25, 2022 (ECF No. 1 ¶ 15) and was employed in her role as a Benefits Coordinator until her termination on July 28, 2023. (ECF No. 1 ¶ 53.) Plaintiff suffers from various health conditions, including Post Traumatic Stress Disorder ("PTSD"), anxiety, and panic attacks, which at times affect her ability

---

[1]        The Court adopts the pagination supplied by the CM/ECF docketing system.

to work. (ECF No. 1 ¶¶ 21-22.) Despite her health conditions, however, Plaintiff was "able to perform the duties of her job well." (ECF No. 1 ¶ 23.)

Although working the front desk was not part of Plaintiff's day-to-day responsibilities as a Benefits Coordinator, she was asked by Defendant to "cover" the front desk about once a month on average, if for example, a receptionist called out of work or utilized a sick day. (ECF No. 1 ¶ 24.)[2] Covering the front desk was a responsibility that was shared with other members of the HR department. (EFC No. 7-2, Ex. G.) While covering the front desk, Plaintiff would "often see an individual come in who was high, under the influence of drugs, or suffering from side effects of drug use." (ECF No. 1 ¶ 25.) This triggered "very serious" PTSD episodes for Plaintiff. (*Id.*) As a result, in or about January of 2023, Plaintiff requested a medical accommodation. (ECF No. 1 ¶ 27; ECF No. 7-2, Ex. A.) Specifically, she asked to either: (a) not be assigned to cover the front desk at all; or (b) answer incoming calls to reception from her actual office space, in order to avoid physical interactions with drug-impacted individuals and members of the public in the confined, high-traffic receptionist area. (ECF No. 1 ¶ 27; ECF No. 7-2, Ex. A.) Plaintiff submitted medical documentation in support of this request. (ECF No. 1 ¶ 28; ECF No. 7-2, Ex. A.)

In a letter dated February 24, 2023, Plaintiff's direct supervisor Curtis Edmonds ("Edmonds") denied Plaintiff's requested accommodations, writing that: (1) because Defendant's business served "disabled Individuals," Plaintiff was likely to interact with them regardless of whether she worked at the front desk or in her office; (2) although Plaintiff expressed a fear of strangers, Plaintiff regularly had to interact with people she didn't know as part of her job; (3) because the door to the main office was locked by default, strangers could remain behind the locked door until the staff member whom they were meeting came to let them in; (4) more information

---

[2]    The exact details of "covering" the front desk are unclear from the Complaint but it is described similar to a "front-desk reception role." (ECF No. 1 ¶ 24.)

from Plaintiff's doctor was required in order to accommodate her; and (5) any long-term accommodation would likely require a reassignment of duties across the HR department, transferring Plaintiff to a vacant position for which she was qualified, or continuous leave. (ECF No. 7-2, Ex. G.)

On or about May 5, 2023, Plaintiff was in a motor vehicle accident and suffered injuries causing pain to her arm, neck, and back. (ECF No. 1 ¶ 32.) Plaintiff presented Defendant with a doctor's note, dated May 25, 2023, which stated that Plaintiff was expected to experience "pain flares," and recommended that Plaintiff work from home during said "flares" and not to lift or carry anything more than 10 pounds with her left hand. (ECF No. 1 ¶ 33.) On or about May 25, 2023, Plaintiff emailed Edmonds, informing him that she was starting physical therapy and explaining that her ability to drive may be impacted. (ECF No. 1 ¶ 34.) In this email, Plaintiff also asked to work from home on May 25, 2023. (*Id.*) Edmonds responded to this email, writing "Ok, understood." (*Id.*) Defendant had an existing policy allowing employees to work from home with approval from management. (ECF No. 1, ¶ 35.)

Between May 25, 2023 and June 13, 2023, Plaintiff's supervisor separated from the Defendant and an interim HR director, Linda Massenberg ("Massenberg") began to supervise Plaintiff and oversee the HR department. (ECF No. 1 ¶¶ 16-19.) According to Defendant, on June 12, 2023, Plaintiff sought an accommodation to work from home continuously due to pain from the motor vehicle accident. (EFC No. 7-2, Ex. H.) On June 13, 2023, Massenberg asked Plaintiff to have her healthcare provider complete an ADA certification form, and granted Plaintiff the option to take unpaid leave if she could not drive to work. (ECF No. 1 ¶ 18; ECF No. 7-2, Ex. H.) On June 14, 2023, Plaintiff's healthcare provider signed and dated a healthcare certification form,

which stated that Plaintiff "can't drive" and "needs to work from home" for "1 month." (ECF No. 7-2, Ex. B.)

On June 14, 2023, at 6:15 a.m., Plaintiff sent an email to Massenberg which stated that she had excruciating pain in her left arm, was not comfortable driving, and that unless Massenberg needed Plaintiff to work remotely, she would use a sick day. (EFC No. 7-2, Ex. H.) On June 14, 2023, at 11:46 a.m., Massenberg responded, offering Plaintiff an Uber at Defendant's expense so Plaintiff could get to work. (*Id.*) Because Plaintiff did not respond to Massenberg's email during the workday, Massenberg "assumed" Plaintiff took the offer of unpaid leave and asked that Plaintiff's access to Defendant's systems be suspended in accordance with "the best practices identified in the HR manual." (*Id.*) On June 14, 2023, at 6:22 p.m., Plaintiff responded to Massenberg, writing that she had been taken to the hospital. (*Id.*)

As a result of the overall animosity and harsh treatment that Plaintiff reportedly experienced from about February through June of 2023, Plaintiff requested a medical accommodation of a hybrid work schedule. (ECF No. 1 ¶¶ 37-38.) Plaintiff communicated to Defendant her mental health complications, her physical complications, and the impact of her seriously ill father, who had suffered a massive stroke in March 2023, on her mental health. (ECF No. 1 ¶¶ 40, 49). Plaintiff also provided medical documentation to Defendant in support of this request, which according to Plaintiff included return-to-work documentation. (ECF No. 1 ¶¶ 39, 41.) A letter provided by Plaintiff's doctor on June 20, 2023 stated:

> The employee may be able to perform the job functions but at a great cost to her mental and physical health . . . Working from home on certain days and in person on other days will likely deescalate tension and stress encountered in typical work-settings . . . Work stressors have impacted her ability to focus, concentrate, and function effectively at work. She might suffer from emotional breakdown if she is continuously exposed to a stressful work environment. Presently, she appears to be showing symptoms of acute stress reaction in a toxic work environment . . .

> [Plaintiff's] stress level is relatively high, and it can easily escalate and precipitate severe panic attack thereby resulting to a mental health/medical emergency.

(ECF No. 7-2, Ex. C.) Another communication Plaintiff's doctor provided to Defendant's CEO, Maku Warrakah-Ali ("Warrakah-Ali"), stated:

> [Plaintiff] discussed with me the type of accommodations that would be most beneficial at her place of work. Although other alternatives exist, however, she appeared to prefer the bimodal type of accommodations or hybrid type if applicable. In the event that the suggested accommodations are not feasible, kindly let [Plaintiff] know so we can explore other viable options.

(*Id.*)

By or on June 22, 2023, however, Plaintiff was prohibited by management from entering Defendant's building. (ECF No. 1 ¶ 41.) All of Plaintiff's access and system login information was canceled, and "for all intents and purposes," Plaintiff was treated as if she was terminated. (ECF No. 1 ¶ 42.) On June 22, 2023, Massenberg communicated to Plaintiff that she could return to work on site once Plaintiff's doctor cleared her to do so, as the information received from Plaintiff's doctor showed that there was "a direct threat of harm to self by working on site." (ECF No. 7-2, Ex. H.)

Plaintiff was permitted to resume working on or about July 3, 2023. (ECF No. 1 ¶ 43.) On that same day, Plaintiff met with Warrakah-Ali to discuss her specific work stressors. (ECF No. 7-1, at 19.) Defendant argues that during this meeting Plaintiff was unresponsive to the interactive process, deferring Warrakah-Ali's questions until she could discuss them with her doctor or feel comfortable talking about them. (*Id.*) Defendant argues further that during this meeting Plaintiff made complaints that she had made several times before, including that she was subject to a toxic work environment, that her supervisor was the source of her toxic work environment, and that the involuntary leave was retaliatory. (ECF No. 7-1, at 22.) According to Defendant, "[t]he only specific information Plaintiff provided related to her supervisor, Ms. Massenberg, whom Plaintiff

alleged scrutinized her work ethic and had done so . . . well before Plaintiff made her accommodation requests." (ECF No. 7-1, at 20.)

On July 11, 2023, Warrakah-Ali sent Plaintiff a letter denying her requested accommodation of a hybrid schedule. (ECF No. 1 ¶ 46; ECF No. 7-1, at 20.) Plaintiff argues that the overall purpose of this letter was to tell her that she doesn't fall under the ADA and that Defendant had no interest in "rehash[ing] her accusations." (ECF No. 1 ¶ 46.) Defendant argues that Plaintiff's request for a hybrid schedule was denied for two reasons: (1) Plaintiff's job required her to be on site; and (2) neither Plaintiff nor Plaintiff's doctor could explain how working from home would be an effective accommodation, as Plaintiff would still be exposed to work stress, including interaction with Massenberg. (ECF No. 7-1, at 20.) Instead of granting her requested accommodation, Defendant "exempted Plaintiff from its attendance policy and permitted Plaintiff to take time off work as needed for her disability." (*Id.*)

On or about July 25, 2023, Plaintiff provided a completed FMLA certification form to Defendant for "intermittent leave on a sporadic basis" to care for her father who was seriously ill following a stroke which rendered him paralyzed on the right side and unable to speak. (ECF No. 1 ¶¶ 47-48.) Plaintiff had discussed her father's serious health conditions with Defendant on several occasions, beginning in or about March of 2023. (ECF No. 1 ¶ 49.) Massenberg approved Plaintiff's FMLA request about four hours later that same day, but in the approval email also told Plaintiff that she was being "reclassified as an employee who is nonexempt from minimum wage and overtime," was now required to "clock in and out for any breaks," would be paid hourly instead of by salary, and that she would be disciplined if she did not document her intermittent FMLA leave properly. (ECF No. 1 ¶¶ 50-51.) According to Plaintiff, other employees who had previously taken FMLA leave were not reclassified in this way. (ECF No. 1 ¶ 52.)

On or about July 28, 2023, Plaintiff was terminated in a 5-page letter sent by Warrakah-Ali. (EFC No. 1 ¶ 53.) This letter based Plaintiff's termination on several different grounds, including "application fraud," "insubordination," "poor performance," and "fail[ure] to meet the job requirements." (ECF No. 1 ¶¶ 54-55.) Plaintiff argues that she was never given prior progressive discipline on issues raised in the termination letter, and that her disabilities, as well as her father's, were motivating factors for her termination. (ECF No. 1 ¶¶ 55, 58.)

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding whether a complaint fails to state a claim upon which relief can be granted, the court is required to accept as true all factual allegations in the complaint as well as all reasonable inferences that can be drawn from the complaint. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). These allegations and inferences are to be construed in the light most favorable to the plaintiff. *Id.* But, the court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Plaintiffs cannot prove facts they have not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Thus, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft*, 556 U.S. at 678. Rather, a complaint must recite factual allegations enough to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.*

## III.    DISCUSSION

Defendant makes numerous arguments in their Motion to Dismiss which the Court will enumerate here: (1) Defendant moves to include multiple exhibits without converting their Motion into one for Summary Judgment; (2) Defendant moves to dismiss Plaintiff's ADA disability discrimination, failure to accommodate, hostile work environment, and retaliation claims (Count I) for failure to state claims; (3) Defendant moves to dismiss Plaintiff's ADA associational disability discrimination claim (Count II) for failure to exhaust administrative remedies; and (4) Defendant moves to dismiss Plaintiff's FMLA interference claim (one of two claims in Count III) for failure to state a claim.

### 1.    Inclusion of Multiple Exhibits Attached to the Motion to Dismiss without Converting the Rule 12(b)(6) Motion to Dismiss into a Rule 56 Motion for Summary Judgment.

A threshold issue is whether the Court may consider the exhibits attached to Defendant's Motion. (See ECF No. 7, Ex. A-I.) When "decid[ing] a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). However, an exception to the general rule holds that when a document attached to a motion to dismiss is integral or explicitly relied upon in the complaint, the document can be considered without converting the motion into one for summary judgment. *Id.* The purpose of the rule against inclusion of documents is lack of notice to a plaintiff. *Id.* Where a plaintiff has actual notice and has relied on those documents in framing the complaint, that concern is dissipated. *Id.* "It is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor

should a plaintiff be able to evade accountability for such documents simply by not attaching them to [their] complaint." *Id.* at 250.

Defendant argues that all nine exhibits attached to their Motion are relied upon in Plaintiff's Complaint. Plaintiff responds that Defendant improperly relies on exhibits that are "not exhibits to the Complaint" in its argument to dismiss the failure to accommodate claim. (ECF No. 8, at 12.) In doing so, Plaintiff argues that Defendant improperly asks the Court to decide the facts of the case, and not to assess whether Plaintiff has pled a plausible claim for failure to accommodate. (*Id.*)

- Exhibit A consists of an email Plaintiff sent Edmonds on December 30, 2022, regarding an anxiety attack Plaintiff had while covering the front desk, another email Plaintiff sent Edmonds on February 23, 2023, to which she attached an accommodation request form, as well as the accommodation request form itself. (ECF No. 7-2, Ex. A.)

- Exhibit B is a healthcare certification form signed and dated by Plaintiff on June 12, 2023, and signed and dated by Plaintiff's doctor on June 14, 2023. (ECF No. 7-2, Ex. B.) The form states that Plaintiff "can't drive" and "needs to work from home" for "1 month." (*Id.*)

- Exhibit C is an undated letter from Plaintiff's doctor to Warrakah-Ali discussing Plaintiff's request for a hybrid work schedule, as well as additional medical information surrounding the request. (ECF No. 7-2, Ex. C.)

- Exhibit D is an email from Plaintiff to Massenberg, notifying her of Plaintiff's plan to submit FMLA documents for a "personal" illness. (ECF No. 7-2, Ex. D.)

- Exhibit E is an email from Plaintiff to Massenberg to which she attached an FMLA request form to care for her father, as well as the form itself. (ECF No. 7-2, Ex. E.)

- Exhibit F is a July 24, 2023, email from Massenberg to Plaintiff, responding to Plaintiff's FMLA request to care for her father. (ECF No. 7-2, Ex. F.)

- Exhibit G is a February 24, 2023, letter from Edmonds to Plaintiff, responding to Plaintiff's request not to cover the front desk. (ECF No. 7-2, Ex. G.)

- Exhibit H is a July 11, 2023, letter from Warrakah-Ali to Plaintiff. (ECF No. 7-2, Ex. H.)

- Exhibit I is Plaintiff's Charge to the Equal Employment Opportunity Commission, signed and dated by Plaintiff on August 11, 2023. (ECF No. 7-2, Ex. I.)

The Court holds that, with the exception of Exhibit D, all exhibits are properly incorporated without conversion of the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment.

Exhibits A, C, E, F, G, H, and I are all explicitly relied upon in Plaintiff's Complaint, and therefore meet the exception to the general rule expressed in *Schmidt*. (*See* ECF No. 1 ¶¶ 8, 27-29, 41, 46-47, 50-52.)

While Exhibit B is not *explicitly* relied upon, the Court holds that it is still *integral* to the Complaint, thus, it too meets the exception. The Complaint alleges that Plaintiff was involved in a motor vehicle accident on or about May 5, 2023, that Plaintiff emailed Edmonds on May 25, 2023, writing that the ramifications of this accident "may impact her ability to drive," and that in this email she requested to work from home for one day. (ECF No. 1 ¶¶ 32-34.) The Complaint also alleges that Plaintiff submitted medical documentation to Defendant regarding the accident, including a doctor's note dated May 25, 2023, and it alleges further that Plaintiff submitted "subsequent medical disclosures and accommodation requests in the May/June 2023 timeframe."

(ECF No. 1 ¶¶ 33, 37.) Exhibit B is a medical disclosure that was submitted in the May/June 2023 timeframe. In Exhibit B, Plaintiff's doctor writes that he started seeing Plaintiff on May 25, 2023, which is the date of the doctor's note explicitly mentioned in the Complaint. Although the Complaint alleges that Plaintiff requested to work from home for a single day because of the accident, Exhibit B shows that Plaintiff also requested to work from home for an entire month because of the accident, and that Plaintiff's doctor completed this form in support of that request. Exhibit B is therefore directly related to Plaintiff's allegations surrounding the May 5, 2023, motor vehicle accident, its inclusion cannot come as a surprise to her, and it is not unfair to hold her accountable for its contents at this stage.

On the other hand, Exhibit D, in which Plaintiff describes her intent to request FMLA leave for her "personal" illness, is not mentioned anywhere in the Complaint either explicitly or otherwise. (ECF No. 7-2, Ex. D.) Based on the information the Court has at this time, Exhibit D does not appear to be connected to Plaintiff's FMLA claims. Plaintiff's Complaint alleges expressly that her FMLA request was "to care for her father's serious health conditions," and does not ever allege that it was to care for her own personal illness. (ECF No. 1 ¶¶ 50-51.) Therefore, this Court holds that Exhibit D does not meet the exception described in *Schmidt* and, as such, shall not be incorporated.

## 2. ADA Disability Discrimination, Failure to Accommodate, Hostile Work Environment, and Retaliation (Count I)

### a. *Disability Discrimination*

The Americans with Disabilities Act ("ADA") provides employee protections against unlawful discrimination based off a qualifying individual's disability. A plaintiff presents a *prima facie* case of discrimination under the ADA by demonstrating: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the

job, with or without reasonable accommodations by the employers; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Tech., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

Although Defendant fails to specifically articulate in their Motion to dismiss Plaintiff's disability discrimination claim, Defendant appears to argue that the claim should be dismissed because: (1) Plaintiff's inability to drive is not a disability under the ADA; and (2) Plaintiff was a "direct threat" to herself and therefore precluded from ADA protections, as continuing to work posed an "imminent risk of a mental health or medical emergency." (ECF No. 7-1, at 18.) In support of the latter argument, Defendant references a communication from Concentra which is not attached to the Motion or referenced in the Complaint, as well as a communication from Plaintiff's doctor, which is attached to the Motion as Exhibit C. (*Id.*)

Individuals with only an inability to drive are not considered disabled under the ADA. *See Robinson v. Lockheed Martin Corp.*, 212 F. App'x 121, 124 (3d Cir. 2007). Driving is not considered to be a "major life activity" under the ADA, and as such, an inability to drive—by itself—does not render one disabled within the meaning of statute. *See id.* (citing *Chenoweth v. Hillsborough Cty.*, 250 F.3d 1328, 1329-30 (11th Cir. 2001) and *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998)).

Even if an individual *is* considered disabled under the ADA, however, disabled individuals who are a "direct threat" to themselves or others, which is defined as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation," are expressly precluded from ADA protections. 29 C.F.R. § 1630.2(r). The direct threat exception is an affirmative defense to a charge of discrimination and may not be appropriate to consider at the motion to dismiss stage. *See Chevron U.S.A. Inc. v.*

*Echazabal*, 536 U.S. 73, 78 (2002) (characterizing the ADA's direct threat provision as an affirmative defense); *Emanuel v. The Walt Disney Co.*, 2021 WL 2454462, at *6-7 (E.D. Pa. June 16, 2021) (holding that it was inappropriate to consider the merits of a direct threat defense at the motion to dismiss stage because there was no established factual record); *see, e.g.*, *Gil v. Vortex, LLC*, 697 F. Supp. 2d 234, 242 (D. Mass. 2010) (stating that defendant's direct threat defense "simply has no place in a motion to dismiss").

The Court holds that Defendant's argument involving Plaintiff's inability to drive is nonsensical, as in Plaintiff's own words, "[n]owhere in the four corners of the complaint does Plaintiff allege her disability is driving . . . [n]or does Plaintiff even allege that her disabilities affect driving and that driving is a major life activity." (ECF No. 8, at 11.) The Court also holds, in accordance with the relevant case law, that it would be inappropriate to consider Defendant's direct threat defense at this stage. The Concentra communication is neither explicitly relied upon in or integral to the Complaint, nor is it attached to Defendant's Motion. Although Exhibit C does raise the *possibility* that Plaintiff may have been a direct threat to herself, the allegations contained in the Complaint, when construed in the light most favorable to Plaintiff, do state a plausible disability discrimination claim. Defendant's direct threat defense should be considered at a later stage of this litigation, after a factual record has been established.

The Court holds that Plaintiff has presented a *prima facie* case of ADA discrimination by alleging other disabilities that do qualify under the ADA, that she "perform[ed] the duties of her job well," and that she was subject to involuntary medical leave and termination. (ECF No. 1 ¶¶ 21, 23, 41-43, 53.) Despite moving to dismiss this claim, Defendant offers no support for why it should be dismissed other than the two arguments discussed above. The Motion is therefore denied with respect to this claim.

      *b.  Failure to Accommodate*

An employer commits unlawful discrimination under the ADA if the employer "does not make reasonable accommodations . . . unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999). To establish this claim, Plaintiff must show that: (1) she was disabled and Defendant knew it; (2) she requested an accommodation or assistance; (3) Defendant did not make a good faith effort to assist; and (4) she could have been reasonably accommodated. *Gardner v. SEPTA*, 410 F. Supp. 3d 723, 741 (E.D. Pa. 2019). Determining whether a particular accommodation is reasonable and whether a defendant could provide it without undue hardship "are factual inquiries that are not properly decided in the context of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Shannon v. City of Phila.*, 1999 WL 126097, at *3 (E.D. Pa. Mar. 5, 1999); *see Kortyna v. Lafayette Coll.*, 47 F. Supp. 3d 225, 241 (E.D. Pa. 2014) ("the question of reasonableness is a factual one"); *see also Gravely v. Speranza*, 219 F. App'x 213, 215 (3d Cir. 2007) ("the question of reasonableness is frequently one that should be left to the ultimate factfinder").

The ADA regulations also state that it may be necessary for the employer to initiate an informal, interactive process with the employee in need of an accommodation. 29 C.F.R. § 1630.2(o)(3); *Taylor*, 184 F.3d at 311. Both sides have a duty to participate in the interactive process. *Mengine v. Runyon*, 114 F.3d 415, 419-20 (3d Cir. 1997). "Specifically, employers are required to make reasonable efforts to communicate with their employee in good faith and assist their employee in determining whether an accommodation is reasonable." *Drapikowski v. Malvern Inst., Inc.*, 2021 WL 5711827, at *4 (E.D. Pa. Dec. 1, 2021). Plaintiff can demonstrate that Defendant failed to participate in the interactive process by establishing that: (1) Defendant knew

about her disability; (2) she requested accommodations or assistance for her disability; (3) Defendant did not make a good faith effort to assist her in seeking accommodations; and (4) she could have been reasonably accommodated but for Defendant's lack of good faith. *Id.*; *Taylor*, 184 F.3d at 319-20. This inquiry mirrors the standard for failure to accommodate under the ADA.

Defendant's Motion discusses four separate accommodation requests Plaintiff allegedly made over the course of her employment. Plaintiff first requested to either: (a) not be assigned to cover the front desk; or (b) answer incoming calls to reception from her actual office space ("First Accommodation Request"). Plaintiff made this request in or about January of 2023. Defendant argues Plaintiff next requested to work from home for one month due to injuries she sustained in an automobile accident ("Second Accommodation Request"). Defendant argues Plaintiff made this request on June 12, 2023. Towards the end of her employment with Defendant, Plaintiff also requested a hybrid work schedule ("Third Accommodation Request"). Plaintiff made this request in or about June of 2023. Finally, Defendant's Motion briefly discusses Plaintiff's claim that she requested intermittent time off from work to treat her medical conditions ("Fourth Accommodation Request").

i.    First Accommodation Request

Defendant argues that although Plaintiff did submit a formal accommodation request not to cover the front desk, dated January 1, 2023, as well as an undated letter from her doctor in support of the request, the doctor's letter was insufficient as it merely disclosed Plaintiff's mental health diagnosis and did not include any information related to Plaintiff's desired accommodation or anxiety triggers. (ECF No. 7-1, at 14.) In the request, Plaintiff alleged she was afraid of "strangers" she may encounter while working the front desk, but as an HR benefits coordinator, Plaintiff regularly had to interact with strangers. (*Id.*) Defendant argues further that Plaintiff never

responded to Defendant's request for more information, never provided a proper healthcare certification, and never proposed any alternative accommodations. (ECF No. 7-1, at 16.) Therefore, in Defendant's view, she effectively abandoned the request.

Plaintiff argues that she has sufficiently pled a *prima facie* case of failure to accommodate. Defendant knew she was disabled and that she requested an accommodation because she submitted a formal accommodation request to which Defendant responded. Her request could have been accommodated because it was "simple" and Defendant had several hundred employees, at least one of whom could have presumably covered the front desk in her stead. (ECF No. 1 ¶ 27.) And finally, Defendant did not make a good faith effort to accommodate her because Defendant "outright denied" her request in a February 24, 2023, letter, even though the request was "very minor." (ECF No. 1 ¶ 30.)

The Court holds that Plaintiff fails to sufficiently plead a failure to accommodate claim with respect to her request not to cover the front desk. Three of the prongs for a *prima facie* case— that Plaintiff was disabled, that she requested accommodations, and that she could have been reasonably accommodated—are not in dispute or are not appropriate considerations at the Motion to Dismiss stage. Defendant argues only that Plaintiff cannot meet the third element of a failure to accommodate claim because Plaintiff did not engage in the interactive process, effectively abandoning her claim. (ECF No. 7-1, at 16.)

The third element of a *prima facie* case requires a plaintiff to show that her "*employer* did not make a good faith effort to assist." *Gardner*, 410 F. Supp. 3d. at 741 (emphasis added). Plaintiff alleges that Edmonds outright denied her accommodation request in his February 24, 2023, letter, even though her request not to cover the front desk was minor and one of the other several hundred employees who worked for Defendant could have covered the desk in her stead. (ECF No. 1 ¶ 29.)

However, looking to the "denial" that Plaintiff alleges, the Court struggles to find where the Defendant outright denies Plaintiff's request. In fact, the letter is titled "Participation in Interactive Process" and requests additional information from Plaintiff in order to "work together to find a solution that is both effective and reasonable." (ECF No. 7-2, at 28-29.) The Court, relying on documents that are integral to the Plaintiff's Complaint, cannot credit the argument that Plaintiff was outright denied their request for accommodation. Defendant's Motion is therefore granted with respect to the First Accommodation Request.

ii.   Second Accommodation Request

The parties' respective framings of the purported second accommodation request differ greatly. Defendant argues that Plaintiff requested to work from home continuously for *one month* because she could not drive due to injuries sustained in an auto accident in May 2023. However, because an inability to drive is not a disability that is covered by the ADA, Defendant argues that it was under no obligation to accommodate her. By contrast, Plaintiff argues in her Response that "nowhere in the four corners" of the Complaint does she allege that her disability is driving, or that her disabilities *affect* driving. (ECF No. 8, at 11.) Plaintiff's Complaint states that Plaintiff presented a note from her doctor after the auto accident, which recommended that Plaintiff work from home during "pain flares." (ECF No. 1 ¶ 33.) The Complaint says further that Plaintiff requested in an email to work from home for *one day* because of the accident, to which Edmonds responded "Ok, understood." (ECF No. 1 ¶ 34.) According to Plaintiff, this request was easily accommodated, as Defendant had a policy allowing employees to work from home with approval from management. (ECF No. 1 ¶ 35.) The Court is required to accept Plaintiff's allegations as true at this stage.

Nowhere in the Complaint does Plaintiff allege that Defendant failed to accommodate a request to work from home for one month because of the accident. As a result, to the extent that Defendant mentions this accommodation request in the Motion, this fact has not been placed at issue by Plaintiff, and therefore the Court will not address it as the Second Accommodation Request is not at issue.

       iii.  Third Accommodation Request

Defendant argues that Plaintiff did not sufficiently engage in the interactive process with respect to her Third Accommodation Request. Specifically, Defendant argues that although Plaintiff's doctor certified that allowing Plaintiff to work from home 3 days per week was an effective accommodation for Plaintiff's mental health conditions, the certification did not show how working from home—which still would have included interaction with her supervisor and coworkers—would have helped accommodate Plaintiff's disability. (ECF No. 7-1, at 18.) Defendant argues that Massenberg asked for clarification on Plaintiff's work stressors, but that Plaintiff deferred to her doctor, who was unresponsive. (*Id.*; ECF No. 7-2, Ex. H.) Defendant further argues that Massenberg then informed Plaintiff she could return to work upon her doctor certifying that working on site no longer posed a serious risk to Plaintiff, but no certification was provided. (ECF No. 7-1, at 19; ECF No. 7-2, Ex. H.) According to Defendant, Plaintiff showed up at the work site anyway but had to be taken to the emergency room in an ambulance. (ECF No. 7-1, at 19; ECF No. 7-2, Ex. H.) After Defendant made several attempts to get clarification on Plaintiff's work stressors, Plaintiff's doctor eventually provided a list of triggers. (ECF No. 7-1, at 19.) Defendant and Plaintiff met to discuss, but Plaintiff allegedly deferred Defendant's questions. (*Id.*) The only specific stressor Plaintiff provided was that her supervisor scrutinized her work ethic. (ECF No. 7-1, at 20.) Ultimately, Plaintiff's request to work from home 3 days per week was

denied because Plaintiff had obligations at the work site, and because she could not explain how hybrid work would be an effective accommodation. (*Id.*) Instead, Defendant exempted Plaintiff from its attendance policy and permitted Plaintiff to take unpaid leave as needed for her disability. (*Id.*)

Defendant also argues that Plaintiff was in fact not subject to ADA protections at all with respect to this request. As the healthcare certification showed that Plaintiff's presence at work posed a direct threat of harm to her well-being, she fell under the direct threat exception to the ADA. (ECF No. 7-1, at 18.) Per Defendant, placing Plaintiff on unpaid leave was the only feasible accommodation that could have been made for her and was therefore not retaliatory. (ECF No. 7-1, at 19.)

In her Complaint, Plaintiff alleges the hostility she experienced at work impacted her existing mental health conditions and led her to request a new accommodation of a hybrid schedule so that she could "occasionally" work from home. (ECF No. 1 ¶¶ 38-39.) According to Plaintiff, she was "able to perform her role 100%" from home. (ECF No. 1 ¶ 39.) Plaintiff alleges that Defendant already knew of her mental health conditions and that she provided Defendant with additional medical documentation to supplement this new request. (EFC No. 1 ¶¶ 36-41.) In the medical documentation, Plaintiff's doctor stated that Plaintiff was open to exploring "other viable options" if her preferred accommodation of a hybrid schedule was not feasible. (ECF No. 7-2, Ex. C.) Plaintiff alleges further that instead of attempting to accommodate Plaintiff, Defendant prohibited Plaintiff from entering the building, canceled "Plaintiff's access and system login information," and treated her as if she was terminated. (ECF No. 1 ¶¶ 41-42.) According to Plaintiff, there was no basis for this involuntary leave of absence, nor was there a basis to deny her an accommodation.

The Court holds that Plaintiff's failure to accommodate claim with respect to the hybrid work schedule is facially plausible. Plaintiff has shown that Defendant knew she requested an accommodation, and she has included sufficient factual allegations, taken as true, showing that Defendant did not make a good faith effort to assist and that she could have been reasonably accommodated. While the healthcare certification Plaintiff provided in support of her request did say that her stress level was high and could escalate to the level of a medical emergency, it also said that this could be avoided if Plaintiff was accommodated. (EFC No. 7-2, Ex. C.) A letter from the same doctor also included in Exhibit C said further that Plaintiff was open to "explor[ing] other viable options." (*Id.*) Instead of engaging in a good faith interactive process with Plaintiff to determine if accommodation was possible, Plaintiff alleges Defendant barred her from the building and treated her as if she was terminated.

Defendant's arguments that the doctor's letter was insufficient support and that her accommodation didn't make sense are factual determinations that the Court will not consider at this stage. Plaintiff is required to show only that her "*employer* did not make a good faith effort to assist." *Gardner*, 410 F. Supp. 3d at 741 (emphasis added). Plaintiff does that here by alleging she was placed on an involuntary leave of absence. Although Defendant appears to argue that it *did* accommodate Plaintiff by exempting her from its attendance policy and permitting her to take unpaid leave, it is not clear whether this was a reasonable accommodation, and regardless, reasonableness is a factual inquiry "not properly decided in the context of a motion to dismiss." *Shannon*, 1999 WL 126097, at *3. Finally, as said above, Defendant's argument that Plaintiff was a direct threat to herself and therefore not subject to ADA protections is an affirmative defense that the Court will not consider at this stage. Defendant's Motion is therefore denied with respect to the Third Accommodation Request.

### iv. Fourth Accommodation Request

Defendant argues that: (1) Plaintiff has plead no facts in support of her allegation that she requested an accommodation to take time off from work to treat her medical conditions; and (2) she has also plead no facts that Defendant denied such a request. According to Defendant, this allegation is therefore a "bald assertion" and should be dismissed. (ECF No. 7-1, at 13.)

Plaintiff does not address the Fourth Accommodation Request in her Response, and although in her Complaint she does allege one instance where she asked to work *from home* for a day, she does not allege any instances where she requested *time off* from work. (ECF No. 1 ¶ 34.) Plaintiff's request to work from home for a day also appears to have been accommodated by Defendant; Plaintiff writes that after asking Edmonds to work from home on Friday, May 25, 2023, he responded "Ok, understood." (*Id.*) Furthermore, Defendant writes in its Motion that after Plaintiff's Third Accommodation Request, it "exempted Plaintiff from its attendance policy and permitted Plaintiff to take time off from work as needed for her disability." (ECF No. 7-1, at 20.)

As the Court cannot find anything in the record supporting Plaintiff's allegation that she requested an ADA accommodation to take time off from work, or that such a request was denied by Defendant, the Motion is granted with respect to this accommodation request, to the extent it existed or was suggested in Plaintiff's Complaint.

### c. Hostile Work Environment

In order for Plaintiff to succeed on a claim for a hostile work environment under the ADA, she must show that: (1) she suffered intentional discrimination because of her disability; (2) the discrimination was sufficiently severe or pervasive to alter the conditions of her employment; (3) the discrimination detrimentally affected her; and (4) it would have detrimentally affected a reasonable person in her position. *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 443 (E.D.

Pa. 2014) (quoting *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999) (collecting cases)). Workplace conduct must be viewed in its entirety, but isolated incidents do not amount to discriminatory changes in the conditions of employment. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).

Defendant argues that Plaintiff has made "no factual pleading" demonstrating that she was subject to a hostile work environment, merely generalized allegations that she was subject to "tremendous hostility," "abusive conduct," "demeaning and/or derogatory treatment," "pretextual admonishment," and that she was "demeaned, scrutinized, and treated very harshly overall." (ECF No. 7-1, at 21.) Defendant argues that these are bald assertions that fail to raise a reasonable expectation that discovery will reveal evidence of the necessary elements. (*Id.* (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).) According to Defendant, the only actual factual allegation Plaintiff makes in support of her hostile work environment claim is that she was subject to an involuntary medical leave, but in fact this involuntary leave was necessary because Plaintiff was at imminent risk of harm to herself if she continued to work. (*Id.*)

Plaintiff argues that these supposedly insufficient allegations, when viewed in full, *do* sufficiently plead a hostile work environment claim. For example, Plaintiff's Complaint states that "there was tremendous hostility towards Plaintiff since January/February 2023 timeframe when [she] disclosed her mental health conditions and requested accommodations," and "[Plaintiff was] demeaned, scrutinized, and treated harshly overall in many ways from in or about February through June of 2023". (ECF No. 1 ¶¶ 36-37.) According to Plaintiff, these allegations establish that the discrimination Plaintiff faced was frequent and lasted for a period of six months. (ECF No. 8, at 14.)

The Court holds that Plaintiff's allegations here are insufficient to survive Defendant's Motion. These allegations of hostility are bald assertions, lacking in specificity, that the Court need not credit at the Motion to Dismiss stage. Plaintiff's inclusion of a time period with these assertions ("lasted for a period of six months") does not change the assertions from conclusory to non-conclusory. Plaintiff must include *factual* allegations in her Complaint that elevate the claim *beyond the level of mere speculation*, but these assertions do not meet the mark, as they are neither factual nor more than speculatory. For example, Plaintiff alleges that she was "treated harshly," but does not say how. The sole factual allegation Plaintiff does provide—the involuntary medical leave—is not enough, by itself, to allow this Court to draw the reasonable inference that Defendant subjected her to a hostile work environment. Isolated incidents do not amount to discriminatory changes in employment, and because Plaintiff references only this single example of alleged hostility, the Court is unable to find her claim plausible and dismisses it without prejudice.

### d. Retaliation

In order to make a *prima facie* case of retaliation, Plaintiff must show: (1) she was engaged in a protected activity, which can include making complaints to management; (2) adverse action was taken by Defendant either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action. *Kacian v. Postmaster Gen. of the United States*, 653 F. App'x 125, 128 (3d Cir. 2016). A request for a reasonable accommodation under the ADA is considered protected activity, and "[t]he element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Fogleman v. Greater Hazleton Heath All.*, 122 F. App'x 581 (3d Cir. 2004); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir.1997).

The Third Circuit, and courts within the circuit, have held that fewer than three months between protected activity and termination sufficiently established causation. *See, e.g.*, *Fasold v. Justice*, 409 F.3d 178 (3d Cir. 2005). Additionally, this Court recognizes that when "temporal proximity between the protected activity and adverse action is unduly suggestive, this is sufficient standing alone to create an inference of causality . . . ." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) ("*Lichtenstein I*") (citing *LeBoon v. Lancaster Jewish Cmty. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). There is no bright line rule as to what temporal proximity is considered "unduly suggestive," but courts have found anywhere from two days to three weeks as being unduly suggestive. *Id.* (collecting cases).

Generally, ADA retaliation claims based on circumstantial evidence are assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Lichtenstein I*, 691 F.3d at 302. However, the Third Circuit has held in § 1983 retaliation cases that the dismissal stage "generally does not allow" for burden-shifting analysis. *Boone v. Nose*, 530 F. App'x 112, 114 (3d Cir. 2013); *See Bond v. Horne*, 553 F. App'x 219, 224 (3d Cir. 2014). These cases echo the United States Supreme Court's unanimous holding in *Swierkiewicz v. Sorema N. A.* that *McDonnell Douglas* "is an evidentiary standard, not a pleading requirement," and Plaintiffs do not need to satisfy the standard in order to survive a motion to dismiss. 534 U.S. 506, 510-11 (2002); *Mohl v. Cnty. of Lebanon*, 2014 WL 12891990, at * 4 n.2 (M.D. Pa. Oct. 22, 2014). The Court holds that this also applies to retaliation cases outside of the § 1983 framework. It would not make sense for the Defendant to, for example, plead a legitimate non-discriminatory reason for a firing, which would then shift the burden back to the Plaintiff to allege that it was pretextual, since that would create a factual issue, not appropriate for determination at the Motion

to Dismiss stage. As a result, the Court, nor the parties, need to engage in the burden shifting practice at this juncture.

Defendant argues only the Plaintiff cannot meet the third element of a retaliation claim: that a causal connection exists between the protected activity and the adverse action. Defendant writes that this element currently rests solely on the temporal proximity of Plaintiff's termination to her accommodation requests and complaints to management, but that the temporal proximity is insufficient. (ECF No. 7-1, at 22.) According to Defendant, Plaintiff made her last accommodation request in mid-June 2023 (the request for a hybrid schedule), and her last complaint of discrimination and retaliation occurred on July 3, 2023, when Defendant met with Plaintiff to identify her work stressors. (*Id.*) However, because nothing new was discussed in the July 3 meeting—the parties merely discussed Plaintiff's mid-June request—in effect over a month had passed between Plaintiff's protected activity and her termination, which occurred on July 28, 2023. (*Id.*) According to Defendant, this is too long of a time to raise an inference that Plaintiff's complaints were the cause of her termination.

Plaintiff argues that the temporal proximity is in fact sufficient. Plaintiff alleges in her Complaint that "in or about June of 2023" she requested an accommodation of a hybrid work schedule, and "[b]y or on June 22, 2023" she was prevented from entering Defendant's building after submitting medical accommodation requests and other medical information. (ECF No. 1 ¶¶ 38, 41.) "[O]n or about July 3, 2023," Plaintiff was permitted to resume working, after "expressing mistreatment" and "complaining that she was punished." (ECF No. 1 ¶ 43.) According to Plaintiff, this evidences less than one month between Plaintiff's protected activity (requesting an accommodation) and her *effective* termination (the involuntary leave), and fewer than two months

between Plaintiff's last protected activity (complaining of mistreatment) and her *actual* termination. (ECF No. 8, at 16.)

The Court holds that there is sufficient temporal proximity to satisfy the causation prong of an ADA retaliation claim. Contrary to what Defendant argues, Plaintiff's termination is not the sole adverse action upon which this claim rests; Plaintiff also alleges that the involuntary medical leave is evidence of retaliation (ECF No. 1 ¶ 69). Accepting the facts alleged in the Complaint as true, there was less than one month between Plaintiff's accommodation request and her involuntary medical leave—possibly fewer than three weeks, which would be unduly suggestive of causality— and fewer than two months between Plaintiff's accommodation request/complaints and her termination. In any permutation, fewer than three months elapsed between Plaintiff's protected activity and the adverse action, which is sufficient to establish causation.

There is more than just temporal proximity to support causation here, however. For example, Plaintiff alleges in her Complaint that Warrakah-Ali, in a "grossly exaggerated and distorted 9-page letter" sent on or about July 11, 2023, told Plaintiff that she wasn't protected by the ADA, "cannot control her emotional triggers," and that Defendant had "no interest" in "rehash[ing] her accusations" of involuntary leave, accommodation denials, and retaliation. Warrakah-Ali fired Plaintiff himself in another letter later that month. This Court must accept Plaintiff's allegations that Warrakah-Ali's irritation with Plaintiff's multiple accommodation requests, the first of which had been submitted half a year earlier, and all of which either he or an employee denied, influenced the calculus used in his decision to terminate her employment.

### 3. ADA Associational Disability Discrimination (Count II)

In order to make a *prima facie* case of associational disability discrimination, Plaintiff must show that: (1) she was "qualified" for her job at the time of the adverse employment action; (2)

she was subjected to adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir. 1997).

However, as with other ADA claims, Plaintiff must exhaust her administrative remedies *before* filing an associational disability discrimination claim in federal court, which necessitates first filing a charge with the EEOC. *Simko v. United States Steel Corp.*, 992 F.3d 198, 204 (3d Cir. 2021). Claims in the federal suit must "grow out of" this charge. *See, e.g.*, *Robinson v. Dalton*, 103 F.3d 1018 (3d Cir. 1997). As there is no bright-line rule for determining whether a claim grows out of a charge, courts make this determination based on the facts unique to each case, with the most important consideration being the charge's factual statement. *Doe v. Kohn Nast & Graf, P.C.*, 886 F. Supp. 190, 196, n.2 (E.D. Pa. 1994); *Giovanni v. Bayer Props., LLC*, 2021 WL 4078055, at *3 (E.D. Pa. Sept. 8, 2021).

Defendant argues that in Plaintiff's Charge, she alleged that she was discriminated against only for her own disabilities, and did not ever allege that she was discriminated against because of her association with her father. (ECF No. 7-1, at 23.) According to Defendant, the sole reference to her father in the Charge was that he was "seriously ill," and that she applied for FMLA leave to care for him. (*Id.*) Defendant argues that Plaintiff made no allegation that he was disabled, that Defendant knew he was disabled, or that her FMLA request to care for him was because he was disabled. (*Id.*) This theory of associational disability discrimination was therefore not included in the Charge, according to Defendant, and Plaintiff has necessarily failed to exhaust her administrative remedies with respect to it. (*Id.*)

Plaintiff argues that although she did not use the words "associational disability discrimination" in the Charge, she did provide factual allegations that support a *prima facie* case of associational disability discrimination. (ECF No. 8, at 17.) The Charge states that Plaintiff performed the duties of her job "well," that she was "terminated," that she "provided a completed FMLA certification form" to Defendant in order to care for her "seriously ill" father, and that she was terminated just "[t]hree (3) days after" submitting said FMLA certification form. (ECF No. 7-2, Ex. I.) Additionally, the Complaint adds that "Defendant was aware of [her] father's serious health conditions, as she discussed the same with Massenberg and Ali on several occasions beginning in or about March of 2023, including her need to take her father to doctor's appointments and physical therapy." (ECF No. 1 ¶ 49.) Plaintiff argues that taken together, these allegations support an inference of associational disability discrimination.

As both parties admit that Plaintiff did file a charge with the EEOC, the sole issue for the Court to determine here is whether Plaintiff's associational disability discrimination claim in fact grows out of her Charge. The Court holds that it does. As argued by Plaintiff in her Response, the Charge suggests that she was qualified for her job at the time of the adverse employment action, that she suffered an adverse action, and that this action occurred under circumstances raising a reasonable inference that her father's condition was a determining factor in Defendant's decision to take the action. Additionally, the Charge suggests that Defendant knew Plaintiff's father was in fact *disabled*, as it states that she "provided a completed FMLA certification form" to Defendant to care for her father who was "seriously ill." The Complaint builds upon this by adding that Defendant was "aware" of her father's serious health conditions and discussed his health and care needs on "several" occasions with Plaintiff. The Complaint also states that Plaintiff's father had suffered a "massive stroke" and as a result was left "paralyzed on the right side and unable to

28

speak." Taking Plaintiff's allegations as true, Defendant was clearly on notice of her father's disability. Based on the allegations in Plaintiff's Charge, and the supporting allegations in Plaintiff's Complaint, the Court holds that this claim does in fact grow out of Plaintiff's Charge and should not be dismissed.

### 4. FMLA Interference (Count III)

In order for Plaintiff to succeed on a claim of interference under the FMLA, she must show that: (1) she was entitled to FMLA benefits; and (2) she was denied FMLA benefits to which she was entitled. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 598 F. App'x 109, 113-14 (3d Cir. 2015) ("*Lichtenstein II*"); *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). The Third Circuit has clearly stated that "for an interference claim to be viable, the plaintiff must show that FMLA benefits were *actually withheld*." *Ross v. Gilhuly*, 755 F.3d 185, 192 (3d Cir. 2014) (emphasis added). Multiple courts within the Third Circuit, however, have held that discouraging employees from using FMLA leave can constitute FMLA interference. *Sabbrese v. Lowe's Home Centers, Inc.*, 320 F.Supp.2d 311, 326-27 (W.D. Pa. 2004); *Grosso v. Federal Exp. Corp.*, 467 F.Supp.2d 449, 462-63 (E.D. Pa. 2006); *Matthews v. N.J. Inst. of Tech.* (772 F.Supp.2d 647, 659 (D.N.J. 2011); *Alred v. Eli Lilly and Co.*, 771 F.Supp.2d 356, 369-70 (D. Del. 2011). This comports with the FMLA's implementing regulations, which state that interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). Discouragement may take the form of imposition of discipline or other actions that "chill" the assertion of FMLA rights. *Reinhold v. County of York*, 2012 WL 4104793, at *12-13 (M.D. Pa. Aug. 31, 2012) (holding that allegations of an employer's imposition of discipline and failure to follow normal procedures in processing leave requests, among other allegations, were sufficient to state a claim for interference); *Grosso*, 467 F. Supp. 2d at 462-65

(holding that a reasonable jury could conclude an employer discouraged an employee from taking FMLA leave after encouraging the employee to pursue other options, such as placing his father in a nursing home).

Defendant argues that although Plaintiff was entitled to FMLA leave, because Plaintiff received the FMLA leave she requested—evidenced by the fact that approval was granted a mere four hours after she applied—she was not denied FMLA benefits and therefore cannot state a claim for FMLA interference. (ECF No. 7-1, at 24.) Plaintiff argues that because she was terminated only three days after the alleged approval, Defendant effectively denied Plaintiff the opportunity to utilize her FMLA benefits. (ECF No. 1 ¶ 84.) Plaintiff also argues that Defendant discouraged her from utilizing her FMLA benefits by reclassifying her as an hourly employee and threatening discipline if she did not document her hours properly. (ECF No. 1 ¶¶ 50-51.) According to Plaintiff, this treatment was "different than others who used FMLA leave in the past." (ECF No. 1 ¶ 52.)

It is undisputed that Plaintiff was fired after requesting, but before taking, FMLA leave to care for her father. It is plausible, therefore, that FMLA benefits were *actually withheld* from her, which supports the viability of her interference claim. Plaintiff specifically alleges a withholding of benefits, writing that Defendant terminated her "to intimidate her and/or prevent her from taking FMLA-qualifying leave." (ECF No. 1 ¶ 84.) Her interference claim is further bolstered by her allegation that Defendant engaged in conduct "which discouraged [her] from exercising her FMLA rights." (*Id.*) Although Plaintiff was not actually disciplined for requesting FMLA leave, she was *threatened* with discipline. (ECF No. 1 ¶ 51.) And, similar to the facts of *Reinhold*, Plaintiff alleges that her reclassification as an hourly employee was a departure from normal office procedure— another indication that Defendant may have chilled Plaintiff's assertion of her FMLA rights. For these reasons, the Court holds that Plaintiff has stated a plausible claim for FMLA interference.

**IV.    CONCLUSION**

For the reasons set forth herein, the Court grants in part and denies in part the Motion. An appropriate order will follow.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**